We move on to our fifth and final case of the day, United States v. Hussain, case number 19-10168. This case has been set for 20 minutes per side, and so counsel, when you're ready, you may proceed. Will you please the court. My name is Alexandra Shapiro and I represent appellant Sushovan Hussain. If I may, I'd like to reserve five minutes for rebuttal. This appeal presents fundamental questions about whether Congress has authorized the federal government to serve as the world's fraud policeman. The Department of Justice prosecuted Mr. Hussain, a foreign national, for conduct that primarily occurred overseas and that was supposedly intended to defraud investors in foreign securities. Hussain was a British accountant who worked in England. Autonomy was publicly listed on the London Stock Exchange. It was governed by English accounting rules and English securities laws. And even in the 2011 deal, it was a Dutch subsidiary of Hewlett-Packard that purchased autonomy securities with British pounds using European banks. Neither the wire fraud statute nor the securities fraud statute, properly interpreted, is broad enough to reach this case. Can I ask a question? Can I ask a question about that? Yes. So, I mean, you appropriately point to all the factors that make this an international or extraterritorial application, but at the end of the day, weren't there wires that were sent to the United States? So, there were, the wire fraud counts all had some wire that in some way or other touched the United States, but I... Well, not in some way or the other. I mean, didn't the defendant actually send a wire to the United States? Well, actually, these wires were not necessarily sent by the defendants. There are several wires that are, for example, there are three counts that involve trust releases that autonomy issued in England that happened to be republished by a publishing service in the United States. Two of them were sent that way, were published in the United States that way. The third one was sent by a third party to Hewlett-Packard. There are other wires that relate to conduct that occurred, among others, at autonomy in the United States or Hewlett-Packard came on the scene, which relate to deals in the United States, but the point here is that this is an accounting fraud case and the issue isn't that the deals were supposedly fraudulent. The government's claim was that the deals were accounted for improperly and our view is that under the Supreme Court's cases, the line of cases starting with Morrison, it's clear that the wire fraud statute is not extraterritorial and then you get to step two, which is what is the focus? The focus is not the wires, the focus is the scheme to defraud. Indeed, in Morrison itself, the Supreme Court specifically distinguished Section 10B, the securities fraud statute, where it said the focus is the securities transaction from a wire fraud statute, which it said was about fraud simpliciter and deception alone were some of the words the court used. In the Ninth Circuit's Garlick case dealing with mail fraud, don't they say that each communication itself can support a separate indictment count? Yes, Your Honor. And isn't it somewhat similar for wire fraud that each use of the wires can support a similar, an independent wire fraud count even if they're all associated with the same fraud? I think that's correct, Your Honor, but the court was not considering the question here, which is what is the focus of the statute for purposes of extraterritoriality? It was merely considering the multiplicity question that Your Honor referred to and also the case predates Morrison as well and I think that it just simply doesn't control this question where we have subsequent Supreme Court case law precisely on the question of extraterritoriality in which the Supreme Court has several times made clear that even though there may be some conduct in the United States, that doesn't mean that an application of a statute is not extraterritorial. And indeed, as the Supreme Court said in Morrison, the presumption against extraterritoriality would be a craven watchdog indeed if it retreated to its kennel in the face of some domestic conduct. So here, there were wires, but they are really incidental to the gravamen of this fraud scheme that was charged, which was an accounting fraud scheme and most of the conduct occurs in the first two years and it all relates to claims that autonomy is filing false financial statements in England pursuant to its obligations under English law and then you get to this transaction and the transaction is a foreign transaction. It's a deal in which a Dutch company purchases autonomy's shares using British pounds and British pence and that wasn't an accident. It was a hacker who selected them to engage in that sort of a transaction for its own tax purposes. The other thing I wanted to mention is when you think about what is the focus of the scheme, I'm sorry, of the statute, the statute prohibits schemes to defraud a victim of money or property and here, the money that was obtained through the deal was in British pounds and I think that's just a further reason why this is really an extraterritorial application of the statute. Where, Ms. Shapiro, where do you see the other circuits on this question? It seems like the Second Circuit maybe disagrees with that point, although maybe you disagree with that characterization. What do you think the state of law is outside the Ninth Circuit on this focus issue? So, the only other circuit that I'm aware of that has addressed the case is the Second Circuit and that Baskunin case and I think Your Honor is right. We do not agree with the analysis of the Second Circuit. We think we would win even under that analysis, but we think the proper way to look at this is to say that the scheme to defraud is the focus. The Second Circuit has a position that's somewhere, I think, between our position and the government's position, which as I understand it, the government's position is clearly that this focuses the wires and the Second Circuit seems to be saying, has a hybrid position that the wires have to be an integral part of the scheme. And I don't think that's really that different from our view in the sense that in order to be an integral part of the scheme, our position would be at a minimum you'd have to have a transfer of money or something far more significant happening with these wires than what's happening here. And so, the only other thing I, there's some district court cases around the country. We've cited some of them in our briefs. Interestingly, there are, I believe, three district court cases from the Second Circuit that predate Baskunin that are more consistent with our position and take the view that the focus is the scheme to defraud. And we would respectfully submit that they had it right, but I think we should prevail under either analysis. So, if the court doesn't have other questions about extraterritoriality, I'll turn briefly to the other, two of the other points I wanted to make. There's one count under 18 U.S.C. 1348, securities fraud, and that has a slightly different analysis there. And in connection with that count, our principal argument is that the government was required to prove that Mr. Hussein's And the government relies on a press release that Hewlett-Packard issued announcing the transaction and a document that Mr. Hussein signed when he sold his shares in autonomy to Hewlett-Packard. And the cases do say that in connection with, it has to be in connection with the U.S. securities. And here, there's no evidence at all that Mr. Hussein had any goal or specific intent to defraud in connection with Hewlett-Packard securities. And the statute says in connection with the securities of a U.S. issuer, sorry, U.S. securities of an issuer, not in connection with a U.S. issuer. And if Congress had intended to more broadly cover any fraud in connection with a U.S. issuer in that statute, it would have spoken more clearly. And then, in addition, even if the court were to reject our arguments on the extraterritoriality and the substance of the wire fraud and securities fraud counts, we would ask the court, at a minimum, to vacate the judgment and grant a new trial because of the erroneous evidentiary rulings. And we've detailed the facts in our briefs, so I just want to reiterate that the restatement was an absolutely critical piece of evidence, which the government referred to repeatedly in its summation and used visuals based on the testimony of Mr. Yellen. This was inadmissible. Even the district court flip-flopped multiple times. It was not approved by the auditors. It was done 14 months after the fact, at a time when Hewlett-Packard was considering litigation against Mr. Yellen. What was it filed with the SEC? The restatement was a restatement of a former subsidiary of Autonomy, and this was filed in the United Kingdom. Okay, so the restatement was of the Autonomy subsidiary and showed that the income or the financial position was significantly worse than the statements that were given to Hewlett-Packard. Is that the background to that? The government presented the testimony of two individuals, principally Mr. Yellen, who eventually became the CFO of the Autonomy division of Hewlett-Packard, if you will. This was a restatement filed in England relating to a subsidiary, and it was based on essentially work that he did long after the transaction. It wasn't approved, it wasn't signed off on by the auditors, and it was done at a time when Hewlett-Packard was preparing for litigation, in anticipation of litigation. Unlike the financial restatement in the Jasper case, which this court affirmed the admission of, this didn't meet the basic criteria under the business records rule. It wasn't prepared at or near the time, it doesn't satisfy the reliability requirement, and it was prepared in anticipation of litigation. It really was inadmissible under 8036 at the get-go, and the government relied heavily on it. If the court doesn't agree with us on extraterritoriality, we would ask for a new trial. The court compounded this error by refusing to allow the defense to introduce other post-closing evidence that would have rebutted materiality and scienter. Unless the court has other questions, I'll reserve the balance of my time. Thank you. Thank you. Thank you, your honors, and may it please the court. My name is Robert Leach. I represent the United States in this appeal, and I was one of the trial counsel below. Soushevan Hussain was properly convicted after a 29-day trial concerning a multi-billion dollar fraud scheme that victimized a public company in the Bay Area. His conviction should be affirmed. I have three main points to make today. First, this was not a foreign fraud. Autonomy was headquartered in San Francisco. For two years, Hussain used U.S. wires in transactions with U.S. companies that fraudulently boosted his revenue. He repeatedly traveled to the United States for meetings and furtherance of the scheme, and he convened daily calls with the victim in the United States where he lied to them directly about autonomy. But I guess the relevant U.S. conduct that we're talking about under your view would be the wire transfer, the wire transactions, the wire communications. That's absolutely correct, your honor. Our view is that the focus of the statute is the use of the wires. My point there is whether it's the use of the wires, the scheme to defraud, or some combination of the two, there was overwhelming evidence of domestic conduct by Hussain and his conspirators in the United States. But, you know, it's interesting. I mean, the fact that he traveled here is interesting, but that might not buttress the wire fraud claims. It seems to me it's the phone calls and actual wire transactions. So were there other communications other than the phone calls? Were any of the press releases sent to the United States? The answer is yes, your honor. The three press releases that were charged in the indictment, and I believe these are counts 7, 8, and 3. Autonomy hired a press company here in the United States to distribute those press releases specifically to U.S. investors here. In addition, with respect to other charges, counts 9 through 12 were phone calls between Soushevan Hussain and HP representatives in Palo Alto, where HP was conducting due diligence. This is the opportunity for the HP representatives to ask Soushevan Hussain directly, what is your revenue? How do you get to this number? There was an express discussion of the Q2 2011 financial statements on one of them. In no way are these phone calls incidental to the scheme to defraud. Can I ask you just to flesh this out? Because I think this is helpful, but let's assume Hussain had only had contacts with HP representatives in the U.K. So he'd been having phone calls and relaying information to the HP representatives in the U.K. They were then, those U.K. representatives were then conveying that information to headquarters in Palo Alto. Would that have been a different analysis or a different outcome as far as extraterritoriality, or would you argue in that case? It doesn't matter. He knew what he was doing. He intended it to get to the Palo Alto, and the fact that he only conveyed it as far as the U.K. reps doesn't change that. Our position, Your Honor, is that's not a different case. If the defendant causes the use of wires in the United States, under our test, that's sufficient. But I need to emphasize, this is a very different case. Each of the counts in the indictment was a wire to or from the United States. It involved either Sushivan Hussain or one of his conspirators. This is not a situation where Hussain was completely in the U.K., and it was only through happenstance that the victim was electing to make wires within its organization. This is a case where the defendant was directing wires to that organization in the United States. But our test is the causing of use of the United States wires, and we think that makes sense because the purpose of the mail and wire fraud statutes are to protect the U.S. instrumentalities of commerce, to protect the mails, to protect the wires from schemes of fraud like this one. And I think all of this reasonably flows from this court's decision in Garlick, but also this court's decision in U.S. v. Pace, which my friend on the other side doesn't even cite in his reply brief. Hussain was a venue case. The question for the Ninth Circuit here was deciding where was venue proper. Was it where the wire started, ended, or passed through, or was it venue where the conspirator was hatching scheme? Can I ask a question? And maybe you're getting to it. Maybe this is the point you're making, but does it even matter? I was trying to figure out if it mattered. I mean, if the focus is the wire fraud versus the scheme, to me, the scheme here is to defraud a U.S. company. There's nothing more. We're happy with that outcome. The point I'm trying to make is even under their tests, even if it's the scheme that counts and not the wires, we still prevail because this was a scheme in the United States. Focusing on the wires makes sense, Your Honors. Focusing on the wires leads a scheme to defraud is unworkable. The scheme is an idea. It's not a location. And only by focusing on the U.S. wires, the act is raised for the defense here. Can courts be faithful to the text of the government's secret code? You referenced this in your brief, and it's not directly relevant, but it's helpful to know. What was the role of the British government in agreeing to send Hussein here for trial? There was no agreement with the U.S. government for Mr. Hussein to come to the United States for trial. Mr. Hussein came here on his own accord, so the government was not required to extradite him. But I think that raises a good point, Judge Brest, which is the U.S. government here worked very closely with the criminal authorities in the United Kingdom. U.K. criminal authorities issued a press release, and we cite this in our brief, where they essentially deferred jurisdiction to the United States. So the notion that in the opening brief that there's some type of conflict between U.S. law and U.K. law or some friction between who has a greater interest in the fraud scheme here is just completely misguided. There's actually a press release from the U.K. government that says we're deferring to the jurisdiction of the United States. To address your question, Mr. Hussein came here voluntarily, extradition was not an issue. Let me ask just a couple questions about the use of this restatement. Wasn't it inconsistent that you could use the restatement in the prosecution, and they could not use the investor call transcripts, saying that Hewlett Packard thought the deal was a good deal even after these problems came out? Are those inconsistent? Your Honor, they are not inconsistent. I think the defense is trying to draw a false equivalency between the restatement, which was filed in the U.K., was filed under penalty of perjury, was filed in conformity with U.K. accounting standards, and the restatement is a look back. It's a statement about what the financial statements were in 2009 and 2010. And the defendant is trying to create a false equivalency between that evidence, which the district court below always thought was relevant, always thought was a business record, and the point where it did give very careful discretion was whether or not this was excludable under 403. The evidence that the defense wanted to get in was collateral. It was impeachments. It was after the fact, and none of it went to essential issues that the jury needed to decide. The restatement went directly to the issue of falsity, whether Soushevan Hussain's statements were false in 2009 and 2010. The other evidence had no bearing on the objective elements of materiality, whether or not this— Why the investor called transcript where the chief executive says that there's been some bumps associated with this acquisition, but they still think it was a great deal and it was just working out some scaling problems. Why would that not be relevant to whether there was actually a misrepresentation as to the value of the purchase? I think if I understand what the court is referring to, it's a May 2012 earnings call where the CEO, Meg Whitman, says, this is a terrific product, and I think the emphasis on product rather than company is significant there. I think what—and the district court weighed all of this in evaluating whether or not this was excludable under 403 was saying they were talking about the underlying technology, not whether or not the historical financial statements were correct or incorrect, not whether or not hardware was concealed or not concealed. This was a very vague statement after Mike Lynch and Soushevan Hussain had left the company after Autonomy had missed its numbers for two consecutive quarters, and the thrust of the statement was we believe in the product, but this company is not hitting its numbers and won't be hitting its numbers. She actually says there is an enormous demand for Autonomy. It's not the competition. It's the classic entrepreneurial company scaling challenges. It may take us a couple of quarters to work through, but I think it is a very smart acquisition. I mean, why wouldn't that have been relevant to whether the valuation was overstated? Well, again, Your Honor, the false statements that the government proved in the trial were Autonomy's historical financial statements and its concealing of hardware revenue from analysts and HP, and all of the analysts said it. It also sounds like the district judge stopped the admission of some, I think it was either e-mails or other materials, indicating that HP had known that a fair percentage of the sales were hardware. Why wouldn't that have been relevant? I think the timing is significant there, Your Honor, and this is an issue that Judge Breyer, very experienced district court judge, gave very careful discretion to. Judge Breyer admitted all evidence pre-acquisition of what Hewlett-Packard knew and didn't know about hardware sales, which Autonomy concealed as appliance sales. Post-acquisition, the judge permitted some evidence from Manish Saran, who testified that he learned after the fact of $100 million in hardware revenue, and he thought it was a mistake. He was shocked. The judge permitted a stipulation that said HP had all of the books and records after the acquisition. It permitted the defense to introduce the fact of the write-down in November of 2012. So the judge was exercising very careful consideration here. What he didn't want was a mini-trial on which any particular individual with Hewlett-Packard knew or didn't know about the hardware after the fact, because it's an objective standard for materiality. On some level, what HP thinks doesn't really matter. It's what the reasonable person who would part with money with property would. The judge recognized that if it was going to permit evidence from Backey Lester, there was no offer of proof that she knew about the hardware sales, that she reacted in a different way. The judge made the very careful decision that this would divulge into a mini-trial, trying to assess what individual actors within HP knew, what they were told before the diligence about the nature and extent of the hardware sales because Autonomy did publicly disclose that they had sold appliances, hardware and software joined together. The district court was really trying to draw a very careful line where he did not want to have a mini-trial on what an individual person within HP knew, what they did with it, and whether or not that was reasonable within a public company with lots of competing circumstances. With Mr. Hussein and Dr. Lynch still working for them, and he made the careful judgment after a lot of consideration. He gave the defense, or he heard three offers of proof from the defense. He asked them to file particular exhibits. He invited oral arguments, and this is at docket number 353. He gave the defense every chance it could to explain the relevance of this. What was the PowerPoint slide? What did that show relative to hardware sales? The PowerPoint slide that Ernst & Young prepared was its summary of its audit of Hewlett-Packard's annual financial statements. When was that done? It was done in November of 2011, Your Honor. And the transaction was when? The deal was announced August 18th, and it closed on October 3rd. Okay, so Ernst & Young's PowerPoint, what included some language or some delineation that hardware had been involved? It included a bar graph on page 7 or 10 of the PowerPoint with the different components of each piece of equipment. It had a very tiny line for 11% hardware. There was no proffer about whether or not that meant hardware or appliances. There was no proffer about whether Ms. Leschak, in the course of evaluating the audit for this $120 billion company, noted that line in the PowerPoint. Ms. Leschak was tangentially involved in diligence. She wasn't on the due diligence phone calls. There was no proffer about what she knew or didn't know about Autonomy's appliance sales. And the judge, after three offers of proof and every opportunity to explain how does this relate to materiality, came to the conclusion that it was too confusing, would result in a mini trial on exactly what Hewlett Packard did or didn't do after that. And that was well within the district court's discretion. I also think, Your Honor, this is harmless. This hardware omission, at the end of the day, went to one component of the government's fraud case. It went to materiality. It went to, but the government's case was a lot more than just hardware. It was the false accounting. It was the false top ten list. Four outside analysts testified that they were unaware of hardware and that it mattered to them. And the district court correctly found, and this is an ER-85, it had every piece of paper belonging to this. After the facts, learning of the hardware, the outcome would have been the same. This is an area where the district court has tremendous discretion and where it also made a finding that admitting all of this evidence at the end of the day would not have mattered. I do want to talk with respect to the restatement, though, because I think this is important and I think it's, you know, this case is on all fours with SEC versus JASPA and the Ninth Circuit decision. The restatement was filed in the UK. It's a public document. You could go find it today. It was done under penalty of perjury. In the restatement, Mr. Yellen, on behalf of his team, is saying that these financial statements are prepared in accordance with particular standards. And that's the test that this court, the Ninth Circuit, laid down in the JASPA case. Virtually all of the arguments that Hussein is raising here with respect to the restatement were raised and rejected by this court in the JASPA case, with one possible exception, and that's the lack of an audit opinion for the restatement. The audit opinion itself is just another opinion by a second auditor. At the end of the day, these financial statements are just financial statements. They're an income statement. They're a balance sheet. They're a statement of cash flows. These are documents that businesses prepare and rely on every day. There's nothing in JASPA or the rule that says a financial statement needs to be added. Which accounting firm did the financial statements or the restatement? Ernst & Young was retained to audit the subsidiary's financial statements. It ultimately did not render an opinion. And if you look at Mr. Yellen's testimony- Let me go back. What I was getting to was who had done the restatement? Was it Ernst & Young or somebody else? The auditor, Ernst & Young, did not render an opinion. The restatement was issued by, signed by Chris Yellen on behalf of the autonomous subsidiary. And remind Chris Yellen, what was his position? Chris Yellen is the CFO. He was the CFO of Autonomy and the director of ASL. He's essentially the person who took Mr. Hussain's place. He's exactly in the same position as Alan Hale, the interim CFO in the JASPA case. Thank you, counsel. Thank you, Your Honor. Your Honor, if I could just make a few points. Just picking up where my adversary has left off. With respect to the restatement, in fact, there are two key distinctions between this restatement and the one this court affirmed the admission of in JASPER. Not only one of the key distinctions is that, as I discussed earlier, the auditor, Ernst & Young, refused to sign off on this one, whereas in the one in JASPER, the auditor rendered an opinion that it was fair. Secondly, and this is very critical, whereas in JASPER, the appellant made an argument that the restatement was not reliable because that company was concerned about possibly being sued due to the errors in its accounting. The court said, no, you know, it has a duty to correct the accounting. And, of course, people get sued all the time for this sort of thing. This was very different. The circumstances under which this restatement was prepared was that Hewlett-Packard was preparing for offense litigation. And I think, I respectfully submit, that's a very different type of scenario and one in which the court cannot be confident that it's sufficiently reliable to meet that prong of the rule. In addition, just picking up quickly on the questions related to the defense evidence that was excluded, as Your Honor pointed out, one of the critical pieces had to do with the hardware. And there was a PowerPoint that showed that it was 11% of revenues, which was presented to Hewlett-Packard in November of 2011. That page is the excerpt of record 1028. And then, in addition, there were other pieces of evidence along the same lines which demonstrated at the same time frame that Hewlett-Packard was being made aware that there were $100 million in revenues from hardware. One other example is excerpt of record 1116. And yet, no one at Hewlett-Packard did anything about it or suggested that they were surprised or concerned about any of this for a whole additional 14 months. And we submitted that was highly relevant to materiality. The district court erroneously took the position that Hewlett-Packard's subjective judgments after the closing are not valid evidence because materiality is an objective standard. But at the same time, allow testimony from analysts and stockholders who had their own subjective views, and as well as Hewlett-Packard employees who had an incentive now to claim that they thought it was important. So it was really unfair that we weren't allowed to introduce that. And it did matter. The hardware issue was discussed ad nauseum in the government's jury addresses. It takes up some 20 pages or so of the transcripts. And then the last thing I want to mention on the defense evidence is that the Meg Whitman statement not only attested to how valuable six months later they still thought autonomy was, but she also mentioned at that point that they had done a fairly deep dive to understand what had happened and why its revenues had gone down in the first quarter after the acquisition. And I think all of that would have been highly relevant to the defense arguments to the jury. With respect to the extraterritoriality, I wanted to make a couple of points. First of all, with regard to the statement about the serious fraud office, if you actually look at supplemental excerpts of records 6294, it's clear that the serious fraud office closed its investigation, which HP had referred to it because it concluded there was insufficient evidence for a realistic prospect of conviction in England. And the case law, including the Supreme Court's cases on this, are pretty clear that it doesn't necessarily matter who the victim is. And here, this was Hewlett-Packard, which for its own reasons, chose to structure this deal so that it could avoid U.S. tax laws and so the deal would be conducted under English law. And the implications of the government's position in this case, it's viewed that the focus is the wires would basically swallow the presumption against extraterritoriality. Under the government's view of the law, if there's a foreign fraud and someone uses an email and the email happens to cross U.S. servers, there could be a wire fraud prosecution in the United States. Similarly, if there's an entirely foreign fraud between foreign parties but someone posts a document to Dropbox and it so happens that the document is actually housed on a server in the U.S., unbeknownst to the fraudster or his victim, suddenly that's the U.S. case. And I respectfully submit that's not what Congress intended, and the Supreme Court has been clear in all of its extraterritoriality cases that the mere fact that some conduct occurs in the U.S. is not sufficient. And indeed, one final point, in the Morrison case, the fraud involved a U.S. subsidiary that was operating out of Florida, of the Australian bank, and the allegations were that executives in the United States conducted false valuations and published them to the marketplace in the United States. And nonetheless, the Supreme Court found that the lawsuit couldn't be brought here. Thank you, Your Honors, and we would ask that the conviction be reversed. Thank you, Counsel. And we'll submit that case now, and we are now concluded for the Monday session. So thank you, everyone. Thank you, both.
judges: R. Nelson, Bress, Gwin